

**SO ORDERED.**

**SIGNED this 01 day of October, 2008.**

_Dale L. Somers_
Dale L. Somers
**UNITED STATES BANKRUPTCY JUDGE**

FOR ONLINE PUBLICATION; NOT FOR PRINT PUBLICATION
**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

In Re:
**JAMES D. WILLS and
MELINDA K. WILLS,**

       **DEBTORS.**

**EDWARD J. NAZAR, Trustee,**

       **PLAINTIFF,**

**v.**

**JAMES D. WILLS,
MELINDA K. WILLS,
THE JAMES D. WILLS AND
MELINDA K. WILLS IRREVOCABLE
FAMILY TRUST,
CLINGAN LEASING,
ROBERT W. CLINGAN, JR., AND
CLINGAN TIRES, INC.,**

       **DEFENDANTS.**

**CASE NO. 05-17977
CHAPTER 7**

**ADV. NO. 06-05337**

**MEMORANDUM OPINION AND ORDER FOLLOWING TRIAL
ON TRUSTEE'S AMENDED COMPLAINT FOR
AVOIDANCE OF FRAUDULENT TRANSFER AND FOR TURNOVER**

The matter before the Court is the Trustee's Amended Complaint for Avoidance of Fraudulent Transfer and for Turnover of Property. The Court has jurisdiction.[1] Following a two day trial, at which the Plaintiff Chapter 7 Trustee, Edward Nazar (hereafter Trustee), appeared by Elizabeth A. Carson of Bruce, Bruce & Lehman, L.L.C. and all defendants appeared by David G. Arst of Arst & Arst, P.A., and the receipt of post-trial briefs, the case was placed under advisement. Having heard the evidence, received the exhibits, and considered the briefs, the Court is now ready to rule. For the reasons stated below, the Court denies the Complaint, except, based upon the concession of the Debtors, the Court finds that the contract rights for the Ute Lake Property and any postpetition payments received by the Trust with respect to those rights are property of the bankruptcy estate.

The Trustee seeks to exercise his power under § 544(b)(1)[2] of the Bankruptcy Code to avoid transfers that at least one of the Debtors' unsecured creditors allegedly could have avoided under K.S.A. 33-204 and -205 of the Kansas Uniform Fraudulent Transfer Act (UFTA). He seeks to recover from The James D. Wills and Melinda K. Wills Irrevocable Family Trust (hereafter Trust) two sets of transfers made to the Trust, one by the Debtors in January 2001 and

---

[1] This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. Furthermore, this Court may hear and finally adjudicate this matter because it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H) and (E). There is no objection to venue or jurisdiction over the parties.

[2] 11 U.S.C. § 544(b)(1). All future references to the Bankruptcy Code shall be to the section only.

Case 06-05337   Doc# 241   Filed 10/01/08   Page 2 of 27

one by MCW, LLC sometime between January and December 2001. He also seeks to recover from defendants Clingan Tires, Robert W. Clingan, Jr., and/or Clingan Leasing some assets involved in the second transfers to the Trust that were later transferred from the Trust to Clingan Tires.

**FINDINGS OF FACT.**[3]

Debtors, James (Jim) and Melinda Wills, filed a voluntary petition under Chapter 7 on October 12, 2005. They are longtime residents of Liberal, Kansas and have two children, twins Drew and Morgan, born in 1993. Jim Wills also has two sons of a previous marriage; one son, Todd, is married and has a masters degree. The other son, Ty, is estranged from the Wills. At the time of filing, both Debtors were employed by Clingan Tires, Jim as general manager and Melinda as Secretary. Melinda's parents are the principal owners of the business. Debtors' Schedule I reports monthly income of $6,548.58. The schedules report assets of $982,226.92, which include rental real estate valued at $526,000 and a homestead valued at $225,000. Total liabilities scheduled are $998,803.58, which include an unsecured priority claim of $15,124.02 to the United States, $815,641 in secured claims, and unsecured claims of $168,038.56, $80,000 of which is a business debt. Assets claimed as exempt are valued at approximately $454,601 and include the homestead and $183,101 in pension plans and similar exempt assets.

---

[3] The Findings of Fact are based primarily upon the bankruptcy pleadings, the testimony, and those portions of the exhibits brought to the Court's attention during trial. Unfortunately, the testimony elicited by the Defendants and the Trustee, who has the burden to prove fraud by clear and convincing evidence, was often imprecise. Although the Court has independently reviewed some of the voluminous exhibits, this examination has not been exhaustive. The Court does not believe that when counsel fails to direct the Court to a particular portion of an exhibit which supports counsel's argument, it has a duty to examine all the exhibits in minute detail to identify evidence supporting counsel's position.

In 1997, Jim Wills, after his employment as president of National Carriers, a cattle hauling business, started a new business, Amigo Carriers, LLC (hereafter Amigo), also a cattle hauling business. James Kimball, through Kimball Livestock & Grain, invested about $70,000, and was a "partner" in the business. An operating line of credit and financing for purchase of rolling stock was provided by Citizens State Bank, now Sunflower Bank (hereafter Bank). In 1998, the Amigo loan balance was $1,200,0000. Amigo's 2000 tax return reported rolling stock having a cost basis of $936,392.

Although there is testimony that James Kimball and Jim Wills "signed the [Amigo] loans," the record is silent as to whether James Kimball had personal liability and, if so, when it ceased. On May 1, 1999, Jim Wills agreed to buy out James Kimball's interest for $63,825.50. Wills became the sole owner of the business. Jim Wills testified that Melinda was added to the Amigo notes at that time,[4] but no detail as to the exact date[5] or the amount of the obligation was provided. Amigo did not prosper and in April 2001 ceased operations. There is no evidence that Jim Wills contested personal liability for the Amigo debt.

Debtors have been engaged in ownership and rental of real property for a number of years. In 1999, Debtors formed MCW Rentals, LLC (hereafter MCW), which became the owner of the properties. MCW is owned 35% by each Debtor and 30% by Debtors' twin children and Todd. Bank also financed MCW. The appraised value of the properties in 2001 was $843,000

---

[4] The Trustee argues that Melinda "had no obligation on the Amigo Carriers loan prior" to 2000, when the Bank "required additional collateral and the personal guaranty of James and Melinda Wills." Doc. 225. This argument is not supported by the record. The 2000 guaranty was of the debts of MCW and, as stated above, James Wills testified that Melinda had liability for the Amigo loan in 1999.

[5] The attachments to the Bank's motion for relief from stay include Third Party Pledge Agreements executed by MCW in 1999 providing that mortgages of MCW's properties secure the obligations of James and Melinda Wills to the Bank.

4

or $863,000 or $874,000. In 2000 and 2001, MCW owned about 16 units and generated in the neighborhood of $12,000 per month income, resulting in about $6,500 gross profit per month. As of January 31, 1999, a financial statement of MCW shows real estate valued at $817,500, subject to mortgages of $459,423.17. MCW also held interests in vehicles and equipment which were leased to Clingan Tires.

Mark Taylor, vice president of Bank, handled the Amigo and MCW loans. He was in close contact with Jim Wills during 2000 and 2001. On May 5, 2000, Mark Taylor wrote to Jim and Melinda Wills stating that the Amigo loan was 26 days past due, the Amigo checking account was overdrawn, and the Bank required additional collateral, either from the MCW rental properties or a mortgage on the Wills' home. In December 2000, the Bank believed there was equity in MCW Rentals. The only activity which the Court finds was in response to the May letter is the Wills' December 4, 2000, personal guarantee of the debts of MCW; that guaranty was secured by mortgages on the MCW properties.[6] At some unknown time, a plan was developed to

---

[6] There is testimony that the Bank was given a second mortgage on some MCW rental properties, but the amounts, the debt secured, and the dates are not apparent. It is possible that this testimony is referring to the Wills' guaranty of the MCW debt to the Bank.

The record does not evidence details concerning the Wills', Amigo's, or MCW's obligations to the Bank. At one time, the Bank loaned approximately $1,200,000 to finance Amigo, but there was no testimony on the amount of the loan on the dates of the transfers to the Trust or the deficiency resulting after the liquidation of the Amigo loan. A financial statement of MCW as of January 31, 1999, lists a debt of $459,423.17 to the Bank and mortgages in the same amount, but there was no testimony of the amount of this debt on the dates of transfers to the Trust, except to the extent that the obligation is reflected in the conflicting financial statements bearing dates close to the times of the transfers.

The only loan documents in evidence are the attachments to the Bank's motion for relief from stay. Case no. 5-17977, Doc. 5. No notes of MCW or Amigo are attached, and the motion asserts only a claim against the Wills. Three notes executed by the Wills are attached: A note dated February 11, 2003 (long after the transfers to the Trust) in the original amount of $374,629.85, for which the payoff was alleged to be $74,050.46 as of November, 2005; a note dated December 10, 2001 in the original principal amount of $202,000, alleged to have a payoff of $274,166.60 as of September 2, 2005; and a note dated December 10, 2001 in the amount of $56,055.18, the entire principal and interest was claimed to be due. The notes state they are for "business" and to "refi Amigo oper exp." Mark Taylor testified the sometime before November 14, 2003, the Bank internally wrote off $202,000, leaving a balance of $342,244.14, but the

5

terminate Amigo's business, sell Amigo's assets, and to apply the proceeds to the Amigo Bank debt. Amigo ceased business as of April 30, 2001, when it had obligations to the Bank, employees, and the IRS. In 2003, Jim Wills made arrangements with the IRS for him to make monthly payments of $500 to satisfy a $15,000 tax liability of Amigo. Those payments were made, and the IRS claim in this case is for penalties.

In the fall of 2000, Melinda and Jim Wills discussed the establishment of an irrevocable family trust. Melinda's maternal grandparents and parents had established trusts. Her grandparents used their trust to assure that property passed to their daughter and grandchildren, rather than to their daughter's husband, who might have remarried. The Wills have a blended family which includes Jim's two children from a prior marriage, one of whom is estranged. A trust for the sole benefit of the twins born of the marriage between Jim and Melinda was a means to assure that Melinda's estranged stepson had no claim to the assets transferred to trust and to pass personal property that has been in Melinda's family to the twins.

Debtors met with an attorney, Greg Swanson, in the fall of 2000. They discussed the reasons why they wanted an irrevocable trust. There was no discussion of their financial situation and no advise concerning protection of their assets from creditors was sought or given. In early 2001, Mr.Swanson prepared The James D. Wills and Melinda K. Wills Irrevocable Family Trust, dated January 21, 2001 (hereafter Trust). The sole beneficiaries are Drew and Morgan Wills, who were seven at the time. On January 21, 2001, the assets identified by the Wills were transferred into the Trust. Those assets were: 81 shares of Clingan Tires stock; 1/3 interest in a cabin in

---

obligor on the note is not identified. There is no evidence that the write off was before or soon after the transfers to the Trust. The Trustee states the "Amigo Carrier loan was paid off with a $202,000 charge off and a rewrite of the MCW loans" (Doc 225), but the Court cannot locate evidence to support this statement.

Breckenridge, CO; a boat; a 1986 BMW; educational funds for the benefit of the Drew and Morgan at Edward Jones under the Uniform Gifts to Minors Act and the Kansas 529 Learning Quest Program; a 2001 Dodge service truck; a gun collection; Waterford crystal; specific items of furniture; and specific items of jewelry. The Trustee did not present testimony of the value of these assets on the date of transfer, either in absolute terms or as a percentage of Debtors' assets.[7] The transfers did not include many of Debtors' valuable assets, including, for example, Debtors' interest in MCW, LLC, which held rental properties appraised at approximately $850,000; Jim Wills' National Carriers' stock, valued by the Debtors in December 2000 at $28,155; or the family residence, valued at approximately $200,000. Rather, the assets appear to have been selected not because of their monetary value but for their sentimental value - to assure that Melinda's children rather than her step children become the owners of property she had received from her family.

On some unknown date in 2001, MCW's interests[8] in vehicles and equipment[9] which were being leased to Clingan Tires, were transferred to the Trust. For some period of time these assets had been owned jointly by Melinda and her brother, Robert Clingan, Jr., d/b/a/ Clingan Leasing, and, on an unknown date, prior to January 31, 1999, Melinda had transferred her interests to MCW. Although counsel for all the parties refer to these transfers to the Trust as having been

---

[7] In response to interrogatories, the Debtors stated the then current value of the assets transferred in January 2001 was approximately $166,180, $114,179 of which was the value of the twin's educational accounts. In their post-trial brief, Debtors assert that in December 2000, shortly before the initial transfer, those assets were worth $141,252, which was about 12% of the Debtors' total assets.

[8] Debtors' counsel referred to this transfer as having been made by Melinda (e.g., Doc. 228, p. 5), but this is clearly erroneous.

[9] The Trustee offered no testimony as to the value of the interests transferred by MCW at the time of the transfers.

7

made in December 2001, the Court finds the evidence does not support this position. Titles for four of the leased vehicles showing the Trust's interest,[10] which are included in the Trustee's exhibits, although stating an application date of December 21, 2001, also state the purchase date was January 20 2001, the same date as the first transfers to the Trust by Debtors. On December 26, 2001, cash rental revenues of $25,587.03 were transferred to the Trust checking account. These funds, which the Court finds are in an amount of approximately ten month's rental income, had been held because of the delay in setting up the Trust's checking account. The precise transferor is unknown, and to simplify the analysis, the Court will assume that it was MCW, LLC. Based upon the foregoing, the Court therefore finds that Debtors' may have intended to transfer MCW, LLC's interest in the leased vehicles as early as January 2001, even though the paper work for the transactions was not completed until later, approximately December 2001.[11]

The Trust transacted business in an open and appropriate manner. It had a separate bank account, its interests in titled property were noted on certificates of title, and it filed income tax returns, prepared by the same accounting firm as had prepared Debtors' returns for twenty years.

The evidence is insufficient to determine whether Debtors were solvent in late 2000 and during 2001. There is a document in the Bank's file showing the Debtors having a net worth of minus $77,800 as of December 31, 2001, but the Court does not find the document persuasive. First, when asked whether it was "an accurate financial statement of the Wills' conditions at that time," Mark Taylor, [the Bank officer on the Debtors' accounts], responded, "Don't know

---

[10] Exh. Nos. 19, 20, 22, and 24. The title for one vehicle, Exh. No. 21 bears a purchase date of December 20 2001 and a title application date of February 6, 2002.

[11] The Court is aware that under Kansas law the transfer of a titled vehicle is not complete absent compliance with the title laws. However, in this case intent to transfer is the controlling issue.

Case 06-05337    Doc# 241    Filed 10/01/08    Page 8 of 27

whether I would have said that was an accurate one at that point." Second, it was prepared sometime after January 14, 2003 by the Bank based upon documents in its file. Third, Mark Taylor, also testified that the real property value in the exhibit may have been understated, and, in any event, the Bank believed there was enough equity to restructure the loan. Jim Wills gave the Bank a balance sheet in February 2002, which shows a net worth of minus $54,400 as of December 31, 2001, but that statement was also shown not to be accurate. It values the MCW rental properties at less than their appraised value and may undervalue the Debtors' home, but it also omits the obligation to James Kimball and the IRS. The exhibits also include balance sheets prepared by Debtors as of December 31, 2000, showing a net worth of $500,043 and as of December 31, 2001, showing a net worth of $596,200. Errors in those statements regarding the value of the interest in MCW, LLC held by the Debtors became apparent at trial and, with his post-trial brief, Debtors' counsel submitted corrected balance sheets for these two dates showing net worth of $237,840 and $311,975 respectively. As pointed out in a post-trial reply brief filed by the Trustee, these exhibits probably overvalue the Amigo rolling stock. The evidence regarding the Wills' net worth in 2000 and 2001 is neither clear nor convincing; it is muddled and conflicting.

It is clear that during 2000 and 2001, Debtors were employed and were current on their obligations, except those arising from the failing Amigo business. Those debts were primarily: (1) The Amigo bank loan, which was going to be satisfied at least in part by the sale of assets, (2) an obligation of Amigo to the IRS for approximately $15,000, which Jim Wills in 2003 agreed to pay at the rate of $500 per month; and (3) the obligation to James Kimball for his interest in Amigo. James Kimball testified that when the obligation was incurred he didn't want the debt to

9

be a burden on Jim Wills, never pressured him to pay the debt, and initially gave him a year when no payments of either principal or interest were due. Sometime in 2001 Debtors paid off the $100,000 mortgage on their home. Debtors had positive cash flow of approximately $38,591 in 2000 and $247,675 in 2001.

Jim and Melinda Wills are the trustees of the Trust and were paid a trustee fee of $26,000 from inception in 2001 through January 2006. The Trust authorizes the trustees to use the income and principal of the Trust for "health, maintenance, support, and education" of the beneficiaries. Trust expenditures included the cost of some of the children's activities, such as vacation travel air fares, a birthday party to which friends were invited, attendance at a dance contest, summer camp enrollment, and purchase of band instruments. In a few instances from 2001 through 2004, the Trust paid for clothing and school expenses. There was no testimony that Debtors used the Trust assets for the day to day costs of support of the children. Cash was transferred from the Trust to the education accounts, also owned by the Trust.

In 2003, in exchange for its share of three month's rent, the Trust's interests in the equipment transferred to the Trust in 2001 were transferred, or attempted to be transferred,[12] to Clingan Tires. Melinda Wills, Robert Clingan, Jr. (who owned a 50% interest in at least some of the leases), and Robert Clingan Sr. examined the leases and agreed that the full value of the equipment had been paid over the life of the leases. The vehicles were high milage and in poor to fair condition. For example, they included delivery trucks with probably 600,000 to 700,00 miles.

---

[12] The vehicle titles were not changed, but the intent to transfer ownership is unrefuted.

Case 06-05337    Doc# 241    Filed 10/01/08    Page 10 of 27

In the summer of 2003, Liberal was hit by tornado and then by a hail storm. Some of the MCW rental properties were seriously damaged. There was only partial insurance coverage. The rental business suffered from both loss of occupancy and the repair costs. Repairs were delayed because of difficulty in finding workers given the widespread damage in the community, thereby increasing the loss of rental income. The Wills' finances did not recover. Although on May 1, 1999, Jim Wills had agreed to buy out James Kimball's interest in Amigo for $63,825.50, he did not pay the debt. Jim Wills testified that if Amigo had succeeded, he would have been happy to pay the obligation. But, since the business failed, he believed it would have been unfair for him to have to pay the obligation to return Kimball's investment, since Jim Wills, as the sole owner, got left with the Amigo debt. In addition, Jim Wills had lost about $50,000 in an unrelated cattle venture with Kimball under circumstances which Jim Wills found questionable. In February 2005, James Kimball and Jim Wills entered into a new agreement for the payment of Jim Wills' buyout of Kimball's interest in Amigo. It provided for the payment of $80,000, with interest at 6.5%, to be paid in quarterly installments.

The Wills made payments to the Bank through 2004. In 2005, the Bank initiated foreclosure proceedings in the District Court of Seward County, Kansas. Shortly before filing for bankruptcy relief on October 12, 2005, Wills attempted to transfer their interest in property located at Ute Lake, New Mexico to the Trust. There are no allegations relating to this transfer in the amended complaint, but it is included in the pretrial order. The Debtors agree that the attempted transfer was of no force and effect and the contract rights for the Ute Lake property and any post filing payment received by the Trust relating to this transaction belong to the bankruptcy estate.

11

**TRUSTEE'S CONTENTIONS.**

The Trustee contends the two sets of transfers to the Trust, one by the Debtors in January and the second by MCW, LLC, also in 2001, are avoidable under § 544(b)(1), which provides:

> (b)(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

This subsection "gives the trustee the right to avoid any transfer of the debtor . . . that is voidable under applicable law by a creditor holding" an allowable unsecured claim.[13]  The applicable state law on which the Trustee relies is K.S.A. 33-204 (a)(1) as to the January transfer, K.S.A. 33-204(a)(1) and (2) as to the December transfer, and K.S.A. 33-205(a).  Those subsections, which are included in the Kansas Uniform Fraudulent Transfer Act (UFTA) which became effective in Kansas on January 1, 1999,[14] provide:

> 33-204. Transfers fraudulent as to present and future creditors.
> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

---

[13] Collier on Bankruptcy ¶544.09 (Alan N. Resnick & Henry J. Sommer eds.-in-chief, 15th ed. rev. 2008).

[14] L. 1998, ch. 13, §§ 1-13.

> (B) intended to incur, or believed or reasonably should have believed that such debtor would incur, debts beyond such debtor's ability to pay as they became due.

> 33-205(a). A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

The "UFTA is aimed at protecting unsecured creditors in situations where the debtor manipulates property to defeat the creditors' interests."[15] It does this by creating a right of action when a debtor transfers property with intent to hinder, delay, or defraud a creditor, or transfers property under certain conditions without receiving reasonable equivalent value.[16]

As to the burden of proof, the Kansas Supreme Court looked to a case decided before the UFTA's adoption.[17] It stated that, in Kansas, "[t]he general rule is, of course, that fraud is never presumed and must be established by clear and convincing evidence. The burden of establishing fraud is upon the party asserting it."[18] "Clear and convincing evidence is not a quantum of proof, but rather a quality of proof; thus, the plaintiff establishes fraud by a preponderance of the evidence, but this evidence must be clear and convincing in nature."[19] "There is nothing in the

---

[15] *McCain Foods USA, Inc. v. Central Processors, Inc.*, 275 Kan. 1, 10, 61 P.3d 68, 75 (2002).

[16] *Id.*

[17] *Id.*, 275 Kan. at 12-13, 61 P.3d at 77, *citing Koch Engineering Co. v. Faulconer*, 239 Kan. 101, 716 P.2d 180 (1986).

[18] *Koch Engineering Co. v. Faulconer*, 239 Kan. at 107, 716 P.2d at 186.

[19] *Newell v. Krause*, 239 Kan. 550, 557, 722 P.2d 530, 536 (1986).

13

Bankruptcy Code to indicate that Congress meant to displace state law standards of proof when the estate seeks to avoid a transaction under section 544" in reliance on state law.[20]  Accordingly, in this case in order to prevail the Trustee must satisfy the burden of proof under Kansas law.

To prevail under K.S.A. 33-204(a)(1), the Trustee has the burden to prove by clear and convincing evidence that Debtors made the January and December 2001 transfers to the Trust with "actual intent to hinder, delay or defraud" a creditor.  Since "[d]irect proof of fraud can seldom be obtained.  . . .  The fraudulent purpose may be shown by conduct and appearance of the parties, the details of the transactions, and the surrounding circumstances."[21]  Badges of fraud are circumstances which frequently attend transfers to hinder, delay or defraud creditors.[22] Subsection (b) of K.S.A. 33-204 enumerates badges of fraud, which may be considered when evaluating whether actual intent to defraud is present for purposes of K.S.A. 33-204(a)(1).  It provides:

> (b) In determining actual intent under subsection (a)(1),
> consideration may be given, among other factors, to whether:
> (1) The transfer or obligation was to an insider;
> (2) the debtor retained possession or control of the property
> transferred after the transfer;
> (3) the transfer or obligation was disclosed or concealed;
> (4) before the transfer was made or obligation was incurred, the
> debtor had been sued or threatened with suit;
> (5) the transfer was of substantially all the debtor's assets;
> (6) the debtor absconded;
> (7) the debtor removed or concealed assets;
> (8) the value of the consideration received by the debtor was

---

[20] *In re Jackson*, 318 B.R. 5, 12 (Bankr. D.N.H. 2004) (avoidance action under New Hampshire Uniform Fraudulent Transfer Act).

[21] *Koch Engineering Co. v. Faulconer*, 239 Kan. at 106, 716 P.2d at 185, *quoting Credit Union of Amer. v. Myers*, 234 Kan. 773 syl. ¶2, 676 P.2d 99 (1984).

[22] *Koch Engineering Co. v. Faulconer*, 239 Kan. at 107, 716 P.2d at 185.

14

reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

There is no rigid rule as to the evidentiary value of the badges of fraud. The Kansas Supreme Court has characterized badges as

suspicious circumstances . . .. They are red flags, and when they are unexplained in the evidence, that may warrant an inference of fraud. Some are weak; others are strong. One weak badge of fraud standing alone, would have little evidentiary value in establishing a fraudulent conveyance. For example, the mere fact that grantor and grantee are related, standing alone, would not support a finding that the conveyance was fraudulent. On the other hand, the concurrence of several badges of fraud are said to make out a strong case.[23]

The UFTA defines insolvency as follows:

(a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

(b) A debtor who is generally not paying such debtor's debts as they become due is presumed to be insolvent.[24]

The Trustee submits that the evidence shows the presence of many of the enumerated badges of fraud such that the Court should find fraud by clear and convincing evidence. The Debtors, on the other hand, submit that few of the badges of fraud are present, that they had valid non-fraudulent reasons for the transfers, and the Trustee has not sustained his burden of proof.

---

[23] *Id.*

[24] K.S.A. 33-202.

15

**ANALYSIS AND CONCLUSIONS OF LAW .**

**A. The K.S.A. 33-204(a)(1) claims.**

The Trustee contends the 2001 transfers to the Trust, by the Debtors and by MCW, LLC were made with actual intent hinder, delay, or defraud a creditor. He relies upon the statutory badges of fraud and other circumstances. The Court will therefore first determine which of the statutory badges of fraud are present with respect to the transfers.

As to the badges of fraud, the Trustee's presentation of evidence, for the most part, did not differentiate between the two sets of transfers. Further, the Trustee made no attempt to differentiate between Jim Wills, Melinda Wills, and MCW, LLC as to the badges of fraud, even though it is clear that some of the assets transferred were the separate property of one of the Debtors and MCW. The Court will proceed to evaluate the evidence under the Trustee's theory of the case.[25]

1. Whether the transfer was to an insider. This element is present as to both transfers.

---

[25] The Court questions whether, as a matter of law, the Trustee could prevail under this approach. K.S.A. 33-204(a)(1) addresses transfers which are fraudulent as to a creditor of the owner-transferor of property. There must be a creditor, ownership of property, and a transfer with actual intent to hinder, delay, or defraud. As to ownership of the transferred assets, Melinda appears to have been the sole owner of some assets transferred in January, such as the Clingan stock, the antique furniture, and the jewelry, and Jim Wills appears to have been the sole owner of the gun collection. Further, neither Jim nor Melinda had a direct interest in the property transferred by MCW, LLC. As to the existence of debt, much of the Trustee's evidence concerning the badges of fraud focused upon the debt resulting from the failure of Amigo, but the evidence regarding that debt was not clear as to either Jim or Melinda. The record contains no personal guaranty of either Jim or Melinda of the Amigo debt and no notes of either Debtor executed prior to December 2001, when they executed two notes referencing Amigo that were secured by mortgages of MCW properties and by the third party pledge agreements of MCW and Amigo. The Court, however, does not believe it has the duty to review the voluminous documents in an attempt to disassemble the evidence to determine if the badges of fraud may have been present when analyzed individually as to each Debtor.

16

2. Whether the debtor retained possession or control of the property transferred after the transfer. This element is present, but only in a limited sense. Debtors retained possession, together with the twins, of the household goods, guns, and jewelry. They retained control of the intangible assets, such as the Clingan stock and the educational accounts. But that control was in the capacity of trustee. There is no evidence that they acted as if the property transferred was not in trust. The Court disagrees with the Trustee's argument that the occasional use of Trust assets for some of the children's expenses, such as vacation travel, purchase of musical instruments, a birthday party, school expenses, and clothing expenses, evidences fraudulent intent. For the most part, the benefits provided to the Trust beneficiaries were luxuries, such air fare for vacation travel to Mexico. It is true that a few of these expenditures, such as the purchase of shoes and clothing, fulfilled a small portion of the Debtors' obligation of support. However, given the absence of evidence that the amounts paid were a significant portion of the annual cost of support of the children and of evidence of a pattern of routine use of Trust property for such purpose, the Court concludes that the Trust expenditures made by the Debtors are not a circumstance evidencing fraudulent intent. The Court finds no evidence that the Debtors disregarded their duties as trustees or used the property for their own personal benefit.

3. Whether the transfers were concealed. The Trustee presented no evidence that the transfers were concealed. Rather, as to those assets for which it was appropriate, such as titled vehicles, there are public records of the transfers. The Trust had a bank account in its own name and filed tax returns, prepared by an independent accountant who had prepared Debtors' returns for twenty years. The Trustee argues that continued use of transferred assets constitutes concealment, but he relies upon dischargeability cases under the Code, not state law fraudulent

17

transfer cases.  The Court does not find that use of the transferred assets, as discussed in reference to the preceding forgoing badge of fraud, evidences concealment.

4. Whether before the transfers were made, the debtor had been sued or threatened with suit.  This element is not present.  Although at the time of the initial transfers, Amigo was failing and after April 2001, Amigo's assets were being liquidated, there is no evidence that the Bank even threatened suit.  Rather in 2001 the Bank was confident that there was sufficient equity to pay the Bank loans.  There is also no evidence that unsecured creditor James Kimball threatened suit.  Debtor Jim Wills made arrangements with the IRS for payments to discharge Amigo's tax obligation.

5. Whether the transfers were of substantially all of the debtors assets.  The Trustee does not contend that this element is present.  After transfer of the assets to the Trust, the Debtors retained valuable assets, including their interest in MCW, LLC, that owned rental properties appraised at approximately $850,000, Jim's National Carriers stock, valued by Jim at $28,155 in December 2000, and the family home, valued at $225,000 in Debtors' schedules.

6.  Whether the Debtors absconded.  This element is not present.

7. Whether the debtor removed or concealed assets.  This element is not present.

8. Whether the consideration received for the assets was reasonably equivalent to their value.  This element is present; the transfers to the Trust were for no consideration.

9. Whether the debtor was insolvent or became insolvent shortly after the transfer was made.  As quoted above, insolvency is defined as the condition where "the sum of the debtor's

18

debts is greater than all of the debtor's assets at a fair valuation."[26]  Trustee makes no attempt to apply the definition by enumerating debts and assets; rather he relies primarily upon balance sheets in the Bank's file.  However, as stated in the Findings of Fact, the Court is unable to determine from the evidence whether Debtors had a negative net worth on their balance sheet in 2001.  There is conflicting evidence as to the Debtors' net worth in 2001.  In any event, if Debtors had a negative net worth as of the dates of the transfers, it is clear that negative amount would have been a small percentage of their total assets.  Debtors were generally paying their debts as they became due.[27]  Further, Debtors had regular income, and neither they nor the Bank regarded Debtors as being unable to satisfy their debts.  The Trustee has not established insolvency as defined by K.S.A 33-202(a), and the presumption of insolvency of K.S.A. 33-202(b) is not satisfied.

10. Whether the transfer occurred shortly before or after a substantial debt was incurred. This element is present, but is not very persuasive as evidencing fraudulent intent.  The evidence does establish that in May 2000 the Bank had requested additional collateral, and in December 2000, the Debtors for the first time personally guaranteed MCW, LLC's debt to the Bank.  But the evidence also establishes that the Bank believed that there was equity in the primary collateral for the MCW loan, the MCW rental properties.  The initial transfers to the Trust were made in January, 2001, shortly after the MCW guaranty.  Amigo closed its doors in April 2001, after the transfers to the Trust by the Wills and *after* the evidence indicates that Debtors may have formed

---

[26] K.S.A. 33-202(a).

[27] As reflected in the Findings of Fact, the Debtors' outstanding obligations related to the failure of Amigo, but those debts were not "due" until after the Trust was fully funded.  In 2001, the Bank was not pressing for payment, James Kimball was not pressing for payment, and there is no evidence that the IRS had attempted to collect Amigo's tax liability from Jim Wills.

19

an intent to have MCW, LLC transfer its interests in Clingan Leasing to the Trust.[28]  Thereafter, in December 2001, Melinda and Jim Wills executed two Bank notes, which appear to be for some of the Amigo debt.  Although the Trustee argues that this is the first time that Melinda had liability for the Amigo loan, the record does not support this contention, since Jim Wills testified that Melinda became liable for Amigo in 1999.  In addition, the 2001 notes, like the 2000 guaranty, were secured by mortgages of MCW properties and the third party pledge agreements of Amigo and MCW.  Trustee did not establish that in 2001 the obligations were under collateralized.  The only transfers to the Trust which the Trustee established occurred after the December 2001 transactions with the Bank are the December 26, 2001 deposit of $25,587 accumulated rental proceeds and one vehicle, a 2002 Dodge.  But as to one of these transfers, the rental proceeds, there is evidence that the intent to transfer had been formed well before December 2001.

11.  Whether the debtor transferred the essential assets of the business elements to a lienor who transferred the assets to an insider of the debtor.  This element is not present.

In addition to the statutory badges of fraud, the Trustee argues that fraudulent intent is evidenced by the additional circumstances that: (1) At the time of the transfers Jim Wills had no intent to pay Jim Kimball, unless Amigo made money; (2) the trust fund tax liability of Amigo had not been paid; and (3) Debtors' alleged failure to keep adequate records of the Trust.  The Court finds no indication of fraud in Jim Wills' attitude toward paying nothing for James Kimball's interest in Amigo unless the business was a success.  What investor in a failed business

---

[28]  If Debtors were personally liable for the Amigo debt, which appears probable but has not been proven by clear evidence, in January 2001 they may have anticipated additional debt, but in an unknown amount, since the Amigo property had not been liquidated.

Case 06-05337    Doc# 241    Filed 10/01/08    Page 20 of 27

who is personally liable for the business' obligations would not be reluctant to honor an agreement, made before the failure of the business, to buyout a former partner when that partner has no liability for the business debt? In this case, that reluctance was enhanced by Jim Will's loss in an unrelated deal with Jim Kimball under circumstances which Jim Wills found questionable. James Kimball, the Trustee's witness, acknowledged that he did not want the debt to be a burden and did not pressure Jim Wills for payment. The Court also cannot infer fraudulent intent for the transfers to the Trust because of Jim Wills' possible personal liability for Amigo's trust fund tax liability. Rather than evade liability for Amigo's taxes, Jim Wills in 2003, well after the transfers in issue, made arrangements for payment of the debt. He honored that agreement. The Trustee's contention of an implication of fraud based upon allegedly failing to keep adequate Trust records is likewise rejected. There is no evidence that the records were inadequate. Tax returns were prepared and filed by an accountant, so it is clear records were kept.

Based upon the foregoing analysis, the Court finds that the Trustee has not proven actual intent to hinder, delay, or defraud creditors by clear and convincing evidence. The Trustee has established the transfers to the Trust were made for the benefit of Debtors' twins without consideration at a time when the Debtors' financial condition was deteriorating. These badges of fraud are not sufficient to sustain the Trustees' burden to prove his case by clear and convincing evidence, given the failure to prove additional significant badges of fraud, most importantly insolvency. The most bothersome of the badges of fraud is the timing of the transfers in relation to three events relied upon by the Trustee: Debtors' first becoming liable to the Bank as guarantors of the MCW's debt in December, 2001; the closing of Amigo in April 2001; and

21

execution of two notes in December 2001. However, this evidence of timing gives rise to only a weak inference of fraud. As to fraudulent intent, the most relevant time is the fall of 2000 and January 2001. During that time period, the Trust was created, Debtors made their transfers to the Trust, and Debtors may have intended to have MCW, LLC transfer its interests in the Clingan Leasing vehicles to the Trust. Only the first of the three events relied upon by the Trustee predate January 2001.

The Debtors and the Trustee disagree about whether, if the Trustee had established a presumption of fraud based upon the badges of fraud, the burden of proof would have shifted to the Debtors to rebut that presumption. Since the Trustee has not provided evidence from which the Court infers fraud, that issue need not be decided. However, the Court pauses to note that it finds credible Debtors' testimony that they made the transfers for family reasons, not to evade creditors. The attorney who prepared the Trust document testified that the Debtors discussed legitimate family financial reasons for the Trust and did not seek any advice concerning asset protection. It is clear that Melinda wanted to assure that property which she accumulated from her family and in her family's business benefitted her children, rather than Jim Wills' children from a prior marriage. The identity of the assets transferred are consistent with this purpose. After the transfers Debtors retained ownership of a significant portion of their property, a fact that is inconsistent with a plan to defraud creditors. Debtors presented evidence that they had positive net worth throughout 2001. In late 2000, the Bank believed the Wills had sufficient equity. Apart from the Bank debt, in January 2001, Debtors had no significant long term or short term debt, except the unrealized and contingent liability which might result from the failure of Amigo. The Trustee presented no evidence of the amount of that debt, other than the IRS claim, which Jim

Case 06-05337    Doc# 241    Filed 10/01/08    Page 22 of 27

Wills made arrangements to pay, and the return of equity formerly promised to James Kimball. At the time of the transfers, Wills were paying their obligations as they became due. The Court finds credible Jim Will's testimony that even after the closing of the Amigo business in 2001, he expected to be able to restructure his debt and meet his obligations. It was not until after the damage to the rental units from storms in 2003 that the Wills' financial fate was sealed.

The Court finds that the 2001 transfers were made to the Trust without actual intent to hinder, delay, or defraud creditors within the meaning of K.S.A. 33-204(a)(1).

**B. The K.S.A. 33-204(a)(2) claim.**

The Trustee alleges that the second set of transfers to the Trust of interests in vehicles, equipment, and cash were fraudulent under K.S.A. 33-204(a)(2)(A).[29] The subsection provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> * * *
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

The Trustee's sole argument in his post-trial brief in support of this claim is as follows:

"There was no value given by the trust for the assets and is does appear that near the time of the

---

[29] The Trustee is not pursuing a claim under K.S.A. 33-204(a)(2)(A) with respect to the January 2001 transfers, as he concedes this claim is time barred. See Doc. 211, Order Denying Motion for Partial Summary Judgment, filed April 23, 2008.

23

transfer, the debtors did not have sufficient assets to cover their obligations." This position is inadequate.

The Trustee makes this allegation based upon two false premises. First the Trustee assumes that all of the transfers, other than those made by the Debtors in January 2001, were made in December 2001. As pointed out in the Finding of Fact, it is not clear when the second set of transfers was made, particularly when the important issue is when Debtors formed their intent to transfer, rather than compliance with state law criteria, such as transfer of vehicle titles.

Second, the Trustee assumes that the transfers were made by Melinda, when in fact they were made by MCW, LLC. The statute clearly requires that the transferor be engaged in a transaction for which the assets remaining after the transfer were unreasonably small in relation to the transaction. The Trustee does not identify any transaction in which MCW was engaged.

Further, if the Court were to accept these assumptions as true, the Trustee would not prevail. The only evidence of a debt transaction by Melinda is with the Bank. In December 2000, she guaranteed the obligations of MCW and in December 2001, she executed two notes, which relate to renewal of the Amigo debt. All of these obligations, the guaranty and the notes, were secured by the MCW properties, and the Bank believed there was equity in the properties at the time Melinda's obligation for the MCW debt was incurred. The Trustee did not present evidence of how the transfer impacted Melinda's ability to satisfy her obligations. If, as testified by Jim Wills, Melinda had personal liability to the Bank for the Amigo debt before the execution of these notes, the Trustee has not shown a new business transaction, except for the contingent liability as a guarantor of a secured debt. Since the record is insufficient for the Court to find

24

Debtors were insolvent in December 2001, there is no clear and convincing evidence that after the transfer Melinda's assets were unreasonably small in relation to her obligation to the Bank.

For the foregoing reasons, the Trustee's claim under K.S.A. 33-204(a)(2)(A) as to the transfer of interest in vehicles, equipment, and cash to the Trust is denied.

### C. The Trustee's K.S.A. 33-205(a) claim.

The final pretrial order includes a claim that transfers were fraudulent under K.S.A. 33-205(a). That subsection provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

The Pretrial Order does not expand upon the Trustee's contention and his trial brief does not separately address the claim. However, a necessary element as to any fraudulent transfer claim under the subsection is that the debtor was insolvent at the time of the transfer or rendered insolvent as a result of the transfer. Since the Trustee has not proven that Debtors were insolvent during 2001, either before or after the transfers were made, the K.S.A. 33-205(a) claim fails.

### D. There is no need to address the Trustee's separate arguments concerning the transfer of exempt assets and the educational accounts.

Since the Court holds that the Trustee has not established fraudulent transfers by clear and convincing evidence, it is not necessary to address what effect the Debtors' ability to exempt some of the transferred assets, such as furniture and jewelry, might have on the Trustee's ability

25

to avoid the transfers under § 544.  Likewise, the unique characteristics of the two types of educational savings accounts transferred to the Trust, the Leaning Quest 529 accounts and the Uniform Gifts to Minors accounts, are not relevant.  Further, since there was no fraudulent transfer, post-petition income received by the Trust cannot be recovered by the Trustee.

**E. The Trustee cannot recover on his claim against Clingan Tires, Robert W. Clingan, Jr. and Clingan Leasing.**

The Trustee asserts claims against defendants Clingan Tires, Robert W. Clingan, Jr. and Clingan Leasing relating to the equipment and vehicle assets transferred to the Trust.  Melinda and her brother Robert W. Clingan, Jr., d/b/a/ Clingan Leasing, were co-owners of the assets, which were leased to Clingan Tires, thereby generating income for the Trust.  Melinda and Robert W. Clingan, Jr. testified that in 2003 the leases were terminated and the equipment purchased by Clingan Tires.

The Trustee questions whether the leases were properly terminated and the assets effectively transferred to Clingan Tires.  He therefore seeks a determination of the Trust's and other defendants' interests in the equipment and vehicles, to recover the property from Clingan Tires, or to preserve the transfer from Trust for the benefit of the estate.  However, all of these theories are premised upon the Court's finding that the transfer of the interests in the equipment and vehicles to the Trust was fraudulent.  The Court has found otherwise.  Since the transfers were not fraudulent, the Trustee has no claim against these defendants.

**CONCLUSION.**

For the foregoing reasons, the Court holds that the plaintiff Trustee has not proven that either the January 2001 or December 2001 transfers to the irrevocable Trust established in 2001

26

for the benefit of the Debtors' minor children were fraudulent under Kansas law. He therefore cannot avoid the transfers under § 544(b)(1), either from the Debtors, the Trust, or any of the additional defendants. However, based upon the Debtors concession, the Court sets aside the attempted transfer to the Trust of the Debtors' interest in property located in Ute Lake, New Mexico, and holds that Debtors' interest and any proceeds from that interest received by the Trust postpetition must be turned over to the Trustee.

The foregoing constitute Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure which makes Rule 52(a) of the Federal Rules of Civil Procedure applicable to this matter. A judgment based upon this ruling will be entered on a separate document as required by Federal Rule of Bankruptcy Procedure 9021 and Federal Rule of Civil Procedure 58.

**IT IS SO ORDERED.**

### ###